In the

# United States Court of Appeals

### For the Seventh Circuit

_____

No. 14-3318

JOCELYN CHATHAM, Administrator of
the Estate of Marvin T. McDonald,

*Plaintiff-Appellant*,

*v.*

RANDY DAVIS, Warden,
Pinckneyville Correctional Center, *et al.*,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Illinois.
No. 11-cv-00650 — **Stephen C. Williams**, *Magistrate Judge*.

_____

ARGUED OCTOBER 26, 2015 — DECIDED OCTOBER 17, 2016

_____

Before WOOD, *Chief Judge*, and BAUER and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Marvin McDonald died after suffering an asthma attack while he was an inmate at Pinckneyville Correctional Center, an Illinois prison. His estate, administered by Jocelyn Chatham, sued the prison's warden,

Wexford Health Services (a private corporation contracted to run the prison's healthcare unit), a prison doctor and nurse, and several prison guards under 42 U.S.C. § 1983. Chatham claimed that the defendants were deliberately indifferent to McDonald's serious medical needs, violating his rights under the Eighth Amendment. A magistrate judge entered summary judgment for the warden and Wexford. The other claims went to trial, and a jury found for the remaining defendants. Chatham now appeals, challenging the order granting summary judgment for the warden and Wexford. She also challenges the denial of her motions for leave to amend her complaint, for discovery sanctions, and for a new trial.

We affirm. The magistrate judge was right to enter summary judgment for the warden and Wexford. Chatham did not produce evidence to support a reasonable inference that the warden consciously disregarded a substantial risk of harm to McDonald. Nor did she have evidence showing that a Wexford policy, practice, or custom caused a constitutional injury. Finally, the judge did not abuse his discretion in declining to allow leave to amend, impose a discovery sanction, or grant a new trial.

## I. Background

McDonald was an inmate at Pinckneyville Correctional Center, an Illinois prison, and was housed in the segregation unit. At about 5 p.m. on May 26, 2010, he began to suffer an asthma attack in his cell. His symptoms persisted, and after a few hours, he told his cellmate about his situation. Unlike certain other units in the prison, the segregation cells did not have emergency call buttons, so his cellmate banged on the cell door to alert the guards. A guard eventually responded

and escorted McDonald to the prison's healthcare unit. By that time it was approximately 12:15 a.m.

Pinckneyville's healthcare unit is run by Wexford, a private company under contract with the Illinois Department of Corrections ("IDOC"). The healthcare unit was supposed to be managed by a permanent medical director, but the post had been vacant for more than a year. To cover the position, two Wexford doctors split the medical director's responsibilities: Dr. Jill Wahl, a traveling medical director, and Dr. Dennis Larson, a regional medical director.

When McDonald arrived at the healthcare unit, he was wheezing and using his accessory muscles to breathe. Nurse Rhonda Reuter checked his vital signs, assessed the oxygen saturation in his blood, and measured his peak expiratory flow rate, which was extremely low. Nurse Reuter started him on oxygen and administered an albuterol nebulizer and epinephrine. She then phoned Dr. Larson for a consult.

Dr. Larson was on call for about a dozen IDOC facilities that evening, although he was only the backup on-call doctor for most of these facilities. He slept through Nurse Reuter's call. At about 2 a.m. he finally returned her call and was briefed on McDonald's situation. He continued the oxygen, prescribed more albuterol, and added prednisone, a steroid. Dr. Larson called back again about a half hour later to check on McDonald's status and was told that he was still using his accessory muscles to breathe. At that point Dr. Larson ordered McDonald transferred to Pinckneyville Community Hospital via ambulance, calling ahead to alert the emergency-room staff of his condition.

In the ambulance McDonald was given more albuterol and another asthma medication. He arrived at the hospital at 3:45 a.m. and was seen by a Dr. Reyes 15 minutes later. Dr. Reyes treated him with more albuterol, still another medication to aid in breathing, and more epinephrine. These treatments continued throughout the early morning hours. At 5:20 a.m. McDonald was still having difficulty breathing, so Dr. Reyes inserted a breathing tube. The initial attempt to insert the tube failed, but by 5:44 a.m. intubation was achieved. It was too late. A Code Blue was called at 5:53 a.m. McDonald died at 6:09 a.m.

Chatham, the administrator of McDonald's estate, filed this § 1983 suit alleging that various prison officials and Wexford were deliberately indifferent to McDonald's serious medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment. In addition to Wexford, the named defendants included Randy Davis, the Pinckneyville warden; Dr. Larson and Nurse Reuter; and the guards who were responsible for monitoring McDonald on the date in question. The claims against the warden and Wexford focused on the lack of a permanent medical director in the healthcare unit and the lack of emergency call buttons in the segregation-unit cells. The complaint also alleged that Wexford failed to adequately train Nurse Reuter in 911 protocols specific to asthma-related emergencies like McDonald's. A magistrate judge entered summary judgment for Warden Davis and Wexford on these claims.

The claims against the remaining defendants—Dr. Larson, Nurse Reuter, and the prison guards—were allowed to proceed. Before trial but after the expiration of the court's deadline to amend the pleadings, Chatham sought leave to

file a third amended complaint to add state-law claims against Nurse Reuter and Dr. Larson. The magistrate judge denied the motion. Chatham also moved for discovery sanctions against Wexford for dragging its feet in disclosing its treatment protocols relating to asthma. That motion, too, was denied. The remaining claims were tried to a jury, which returned a defense verdict. After an unsuccessful motion for a new trial, Chatham appealed.

## II. Analysis

Chatham seeks review of four separate orders: (1) the magistrate judge's order granting summary judgment for Warden Davis and Wexford; (2) the denial of leave to file a third amended complaint; (3) the denial of discovery sanctions; and (4) the denial of her motion for a new trial.

### A. Summary Judgment

We review the magistrate judge's summary-judgment order de novo, viewing the record in the light most favorable to Chatham and drawing all reasonable inferences in her favor. *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

Chatham alleged that Warden Davis and Wexford violated McDonald's rights under the Eighth Amendment by deliberately failing to mitigate risks to the health and safety of inmates in the Pinckneyville prison in several respects. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*,

428 U.S. 153, 173 (1976)). A prison official may be liable for deliberate indifference only if he "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A medical deliberate-indifference claim requires proof that the prisoner suffered from "(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008).

McDonald's asthma attack, which ultimately proved fatal, plainly qualifies as an objectively serious medical condition. The question here is whether Chatham produced sufficient evidence on the state-of-mind element of the claim. The inquiry is a subjective one: "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see also Petties v. Carter*, No. 14-2674, 2016 WL 4631679, at *3 (7th Cir. Aug. 25, 2016) (en banc) ("[T]he Supreme Court has instructed us that a plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm."). "The requirement of subjective awareness tethers the deliberate-indifference cause of action to the Eighth Amendment's prohibition of cruel and unusual punishment … ." *Whiting v. Wexford Health Sources, Inc.*, No. 15-1647, slip op. at 6 (7th Cir. Oct. 12, 2016).

Chatham argues that Warden Davis was deliberately indifferent in two respects: (1) He failed to install emergency call buttons in the segregation unit and (2) he failed to ensure that the position of permanent medical director was

filled in a timely fashion. The evidence doesn't support either contention.

Nothing in the record suggests that Warden Davis had actual knowledge of specific facts that would support an inference that the absence of emergency call buttons created a substantial risk of harm. There's no evidence, for example, that he ignored recommendations to install such a system or that he was aware of previous emergencies in the segregation unit that the presence of call buttons would have averted. *Cf. Petties*, 2016 WL 4631679, at *4 (discussing the types of evidence that can show a prison doctor's deliberate indifference to an inmate's serious medical need).

The closest thing Chatham has offered is the fact that certain other units in the prison are equipped with emergency call buttons. But the presence of call buttons in other parts of the prison does not establish that Warden Davis actually knew that the failure to have such a system in the segregation unit created a substantial risk of harm. It *might* be considered weakly probative of *negligence*, but that's not the standard; it's well established that "showing mere negligence is not enough" for a deliberate-indifference claim. *Id*. at *3; *see also Steidl v. Gramley*, 151 F.3d 739, 740 (7th Cir. 1998) (A warden does not violate "the Eighth Amendment when he might have known of a risk of harm, or in any event *should have* known.").

Nor does Chatham have any evidence to show that Davis knew that the failure to have a permanent medical director in place would put inmates at substantial risk of harm. Indeed, no evidence suggests that the lack of a *permanent* medical director had any effect on inmate health and safety at all. Drs. Larson and Wahl were covering these duties until

a permanent medical director could be hired. Although the position remained unfilled for a long time, Chatham has offered no evidence to show that this situation caused an increased risk to inmate health and safety. Summary judgment for Warden Davis was appropriate.

The claim against Wexford proceeds under the theory of municipal liability announced in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), which we've held applies in § 1983 claims brought against private companies acting under color of state law. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 795–96 (7th Cir. 2014). To prevail, Chatham needed to present evidence that a Wexford policy, practice, or custom caused a constitutional violation. *Whiting*, slip op. at 10; *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (discussing municipal liability for Eighth Amendment violations). She did not do so.

Chatham focuses on Wexford's failure to fill the permanent medical-director position and its failure to train Nurse Reuter in 911 protocols specific to emergencies like McDonald's. As we've already noted, however, no evidence suggests that the failure to promptly fill the permanent medical-director position created a substantial risk of harm. Nor is there evidence showing that Wexford was aware of such a risk, assuming it existed. *Monell* claims based on allegations of an unconstitutional municipal practice or custom—as distinct from an official policy—normally require evidence that the identified practice or custom caused multiple injuries. *Id.* ("[T]here is no clear consensus as to how frequently [an injury] must occur to impose *Monell* liability, except that it must be more than one … or even three [times].") (citation and quotation marks omitted);

*Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (stating that a custom or practice claim "requires more evidence than a single incident to establish liability"). No such evidence exists here.

Chatham insists that she didn't need this kind of evidence because the possibility of harm was obvious. It's true that in a "narrow range of circumstances," the possibility of harm from a custom or practice may be so obvious that evidence of a series of prior injuries is not needed to support an inference of deliberate indifference. *Calhoun*, 408 F.3d at 381 (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)); *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004). This isn't one of those rare cases. Chatham's sole evidentiary support for this claim is that Dr. Larson was on call for about a dozen facilities the night of McDonald's asthma attack. (Recall, however, that he was the *backup* on-call doctor for most of those facilities.) Chatham suggests that a permanent medical director wouldn't have slept through Nurse Reuter's emergency call as Dr. Larson did. But the record doesn't tell us why Larson slept through the call or what nightly on-call duties a permanent medical director would be required to carry. Chatham's argument rests entirely on speculation and was rightly rejected.

Chatham also argues that Wexford failed to train Nurse Reuter in 911 protocols specific to emergencies like McDonald's, and this amounts to a "practice" or "custom" sufficient to support *Monell* liability. Here too she offers no evidence that the lack of asthma-specific 911 training created a substantial risk of harm, that Wexford knew of such a risk (if it existed), or that this "practice" or "custom" caused

McDonald's injury. To the contrary, the only evidence on this point comes from Cheri Laurant, Wexford's Rule 30(b)(6) designee. *See* FED. R. CIV. P. 30(b)(6). She testified that Wexford's nurses are trained—indeed, they already know, based on their professional education—to call 911 in a life-threatening emergency; they need not wait for a physician referral. This argument too was rightly rejected. Summary judgment for Wexford was entirely appropriate.

## B. Chatham's Three Other Motions

With the challenge to the summary-judgment order out of the way, we proceed to the other orders Chatham asks us to review.

### 1. *Motion to Amend the Complaint*

Two months after the deadline for amending the pleadings expired, Chatham moved for leave to file a third amended complaint to add nursing-negligence and wrongful-death claims against Nurse Reuter and Dr. Larson. The magistrate judge denied the motion because Chatham didn't provide a reasonable explanation for her delay and the late-stage amendment would have caused undue prejudice to Reuter and Larson.

We review the denial of a motion to amend a complaint for abuse of discretion. *Pugh v. Tribune Co.*, 521 F.3d 686, 698 (7th Cir. 2008). A plaintiff may amend his complaint once as a matter of course, but subsequent amendments require either the consent of an opposing party or the court's leave. *See* FED. R. CIV. P. 15(a). While a judge should "freely give leave [to amend] when justice so requires," RULE 15(a)(2), refusal to allow an amendment is appropriate where, as here, a plaintiff has unjustifiably delayed or when an oppos-

ing party would suffer undue prejudice, *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004).

Chatham asserts that the magistrate judge abused his discretion but she does not explain how. She argues only that her proposed new state-law claims were factually related to the § 1983 claims, so little additional discovery would be required. The magistrate judge reasonably rejected that argument and found the delay both unexcused and prejudicial. Chatham has given us no good reason to disturb that ruling, and we see none ourselves.

### 2. *Motion for Discovery Sanction*

During discovery, Wexford was late in disclosing its nursing treatment protocols relating to asthma. Chatham moved to sanction Wexford for this error, but the magistrate judge denied the motion after determining that the tardy disclosure was not made for tactical advantage and was not prejudicial.

We review this decision too for abuse of discretion. *Park v. City of Chicago*, 297 F.3d 606, 614 (7th Cir. 2002) ("A trial court has broad discretion concerning the imposition of discovery sanctions."). Little discussion is needed. Chatham hasn't pointed to any evidence of bad faith and doesn't explain how the delayed disclosure could possibly have prejudiced her. We find no abuse of discretion.

### 3. *Motion for a New Trial*

After the jury returned its verdict in favor of Dr. Larson, Nurse Reuter, and the prison guards, Chatham moved for a new trial. The magistrate judge denied the motion, and

again our review is for abuse of discretion. *See Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004).

Chatham argues that a new trial is warranted because the magistrate judge improperly limited the testimony of her expert witness. She claims that her experts were required to closely hew to their expert reports during their testimony, while the defendants' experts were allowed to "deviate substantially from their reports" and to "opine at will on the standard of care."

This claim of unequal treatment is simply not borne out by the record. The judge's pretrial order equally—and explicitly—limited both sides' expert testimony to matters covered in the experts' reports. Chatham hasn't identified any particular testimony from the defense experts that should have been excluded, nor has she sufficiently explained what her experts were unfairly precluded from saying. There's no basis in the record to conclude that the limits on expert testimony were unevenly enforced.

Chatham also argues that the magistrate judge improperly admitted evidence of McDonald's arrest history in violation of Rule 403 of the Federal Rules of Evidence. Character evidence of this sort is usually inadmissible. *See* FED. R. EVID. 404(a)(1). But part of Chatham's claim for damages relied on the lost relationship between McDonald and his son. Attaching a value to this loss required proving "the quality of advice and support that [McDonald] could have supplied" to his child, thus putting McDonald's character squarely at issue. *Cobige v. City of Chicago*, 651 F.3d 780, 785 (7th Cir. 2011).

Of course relevant evidence may still be excluded "if its probative value is substantially outweighed by … unfair prejudice." FED. R. EVID. 403. Chatham argues that this evidence flunks the Rule 403 balancing test because McDonald's arrests occurred before his son was born. The magistrate judge was entitled to see things differently and strike the balance accordingly. But even if we agreed that an evidentiary error occurred, the judge was well within his discretion to refuse to grant a new trial in the face of this claim of error. *See Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 611 (7th Cir. 2002) ("A new trial may be granted in the event of an error in the admission of evidence in extraordinary situations."). McDonald's arrest history was admitted on the question of damages, but the jury returned a no-liability verdict and never reached that question. Chatham's motion for a new trial was properly denied.

AFFIRMED.