In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 23-3262 & 23-3343

BLAKE STEWARDSON,

*Plaintiff-Appellee, Cross-Appellant,*

*v.*

CHRISTOPHER TITUS,

*Defendant-Appellant, Cross-Appellee,*

*and*

CAMERON BIGGS, *et al.,*

*Defendants-Cross-Appellees.*

———————————

Appeals from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:18-cv-00958-DRL-MGG — **Damon R. Leichty**, *Judge.*

———————————

ARGUED SEPTEMBER 27, 2024 — DECIDED JANUARY 23, 2025

———————————

Before BRENNAN, JACKSON-AKIWUMI, and PRYOR, *Circuit Judges.*

BRENNAN, *Circuit Judge.* After police arrested Blake Stewardson for driving under the influence of alcohol on New

Year's Eve 2018, his night went from bad to worse. He was taken to a jail in Cass County, Indiana, where officers repeatedly subjected him to force—some excessive, some not.

Following that night's events, Stewardson sued various parties, including Officer Christopher Titus, Officer Cameron Biggs, and the Sheriff of Cass County, alleging violations of his civil rights. The district court granted summary judgment to the defendants on many of the claims, but, as relevant here, two proceeded to trial: one against Titus for excessive force and one against Biggs for failing to intervene. The jury found only Titus liable and assessed a significant punitive damages award against him. On appeal, Titus asks us to reduce that award on constitutional grounds. Stewardson cross-appeals, disputing several of the district court's summary judgment decisions.

## I. Background

We begin with how we view the facts for the appeal and cross-appeal. Titus challenges a punitive damages award, so the facts are viewed in the light most favorable to the jury's verdict. *Est. of Moreland v. Dieter*, 395 F.3d 747, 757 (7th Cir. 2005); *see also Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1024 (7th Cir. 2016) (viewing "the facts as the jury found them"). Stewardson's cross-appeal, on the other hand, comes to us after a grant of summary judgment, at which courts "read the facts and draw all reasonable inferences in the light most favorable to … the non-moving party"—here, Stewardson. *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1043 (7th Cir. 2023).

Those facts are as follows: On January 1, 2018, shortly after midnight, Stewardson was arrested for driving under the influence of alcohol. He was taken in handcuffs to the Cass

County Jail. Upon arrival, Stewardson was visibly intoxicated, and he began directing profanities at police. At intake, officers attempted to pat him down, but he struggled, making the task more difficult. During the attempted search, surveillance video shows that Titus slammed Stewardson's face against a wall while he remained handcuffed. Titus's supervisor, Biggs, was walking over to help restrain Stewardson and witnessed this use of force. After Biggs arrived to assist, Titus again slammed Stewardson's face into the wall. As a result, Stewardson received a cut over his left eye, which began to bleed.

Following the head slams, Biggs decided officers would need to move Stewardson to the jail's padded cell to complete the search. Biggs and Titus guided Stewardson to the cell, and immediately upon entering, Titus executed a leg sweep, taking Stewardson's feet out from under him. Stewardson fell to the ground and hit his head. The officers then restrained Stewardson, and Titus began removing his handcuffs. He successfully uncuffed one of Stewardson's hands. But because the key for the handcuffs broke in the lock, Titus was unable to uncuff the other hand. While one officer went to retrieve bolt cutters to free the handcuffs, other officers kept Stewardson pinned to the ground for more than twenty-five minutes.

During this time, the partially handcuffed Stewardson began to struggle with police. To regain control of him, Biggs delivered what is called a "common peroneal knee strike." This involves driving one's knee into the common peroneal nerve located in the leg of another. Biggs had been trained how to properly execute this strike. After recovering control of Stewardson, police were able to remove his handcuffs. But, according to officers, Stewardson remained non-compliant,

refusing orders to stay on his stomach and directing additional profanities at them. So, Biggs employed another knee strike.

According to Biggs, Stewardson made a suicidal comment while he resisted the officers. Stewardson cannot recall whether he made such a comment, but he did not deny doing so. As a result, officers removed his clothing and brought an anti-suicide blanket to the padded cell. Once he was left alone, Stewardson unsuccessfully attempted to cover the cell's camera with the blanket. In response, Biggs instructed officers to place Stewardson in a restraint chair.

Titus returned to the padded cell before the restraint chair arrived. He spoke to Stewardson for a few seconds through a window in the cell door. The officer then abruptly swung the door open and into Stewardson, briefly pinning him to the wall. Titus entered the cell and performed a hip toss—he lifted Stewardson off the ground and across his body before throwing Stewardson back to the floor. This occurred approximately thirty minutes after Titus had executed the leg sweep. Biggs was in the jail's intake area but not present in the padded cell to witness the hip toss. Officers then strapped Stewardson to the restraint chair where he remained for the next forty minutes.

In November 2018, Stewardson filed various claims against Titus, Biggs, and the Sheriff of Cass County under 42 U.S.C. § 1983 arising out of these events. Relevant here, he sued Titus and Biggs for using excessive force. Stewardson asserted Titus's head slams, leg sweep, and hip toss were all unlawful uses of force. As for Biggs, Stewardson claimed the two knee strikes amounted to excessive force. He also alleged Biggs failed to intervene between Titus's separate instances of

force. For his claim against the Sheriff, Stewardson relied on *Monell v. Department of Social Services*, 436 U.S. 658 (1978). He accused the Sheriff of maintaining an unconstitutional custom of stripping uncooperative inmates in the Cass County Jail.

The Sheriff moved for summary judgment on Stewardson's *Monell* claim, which the district court granted. Biggs also moved for summary judgment, which was granted in part. The court determined that Biggs was entitled to qualified immunity on Stewardson's excessive force claim. But it allowed Stewardson to proceed with his failure-to-intervene claims.

Biggs later requested that the district court reconsider his motion for summary judgment on the failure-to-intervene claims. The district court obliged but again denied the motion on Stewardson's claim that Biggs failed to intervene between Titus's head slams and leg sweep. It explained that "Biggs was present and witnessed both uses of excessive force," so the claim could proceed. But the court changed course on the claim that Biggs failed to intervene between Titus's leg sweep and hip toss. This time, it ruled that Biggs was entitled to qualified immunity. The court reasoned Biggs "wouldn't have known or understood that his failure to intervene to prevent a later 'hip-toss'—separated by time, observation, and presence was unlawful." Biggs then appealed the district court's decision partially denying him qualified immunity, but we dismissed for lack of jurisdiction. *Stewardson v. Biggs*, 43 F.4th 732, 734 (7th Cir. 2022).

Relevant to this appeal are two of Stewardson's claims that went to trial—one against Titus for using excessive force and a second against Biggs for failing to intervene between Titus's head slams and leg sweep. A jury found Titus liable for employing excessive force and awarded Stewardson $400,000 in

compensatory damages and $850,000 in punitive damages. The jury concluded that Biggs was not liable for failing to intervene.

Following the verdict, Titus moved for remittitur, or in the alternative a new trial, arguing the jury's punitive damages award was unconstitutionally excessive. The district court denied that motion, and Titus now appeals. He renews his argument that the punitive damages award assessed against him violates due process.

Stewardson cross-appeals, asserting the district court erred in granting Biggs qualified immunity on his other failure-to-intervene claim and on his excessive force claim. Stewardson also contends the court incorrectly granted the Sheriff of Cass County summary judgment on his *Monell* claim.

We begin by analyzing Titus's challenge to the jury's punitive damages award and then turn to Stewardson's cross-appeal.

## II. Punitive Damages

Nobody disputes that Titus's misconduct warrants a punitive damages award. Rather, the parties disagree on whether the award is unconstitutionally excessive. Titus asks this court to reduce the $850,000 in punitive damages assessed against him to $50,000. We decline his invitation to alter the judgment.

Section 1983 "create[d] 'a species of tort liability' in favor of persons deprived of federally secured rights." *Smith v. Wade*, 461 U.S. 30, 34 (1983) (quoting *Carey v. Piphus*, 435 U.S. 247, 253 (1978)). The statute is not itself a source of substantive rights but, instead, "provides a mechanism for enforcing individual rights." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002).

The Supreme Court has long held that punitive damages are among the enforcement mechanisms available in a § 1983 action. *Smith*, 461 U.S. at 56. Although the statute says nothing about punitive awards, they are available as a matter of common law. *See id.* at 34. Punitive damages are only appropriate, the Court has said, when a defendant's conduct was driven "by evil motive or intent" or when "it involve[d] reckless or callous indifference to the federally protected rights of others." *Id.* at 56. Given § 1983's silence on punitive awards, it does not establish a statutory cap. The Constitution nonetheless imposes an outer limit on the size of permissible awards. *See Est. of Moreland*, 395 F.3d at 756. Because punitive damages are "retributive in nature," they must comply with principles of due process. *Saccameno v. U.S. Bank Nat'l Ass'n*, 943 F.3d 1071, 1086 (7th Cir. 2019). Where, as here, a party challenges a punitive award on due process grounds, we assess the award de novo, *id.*, viewing the facts in the light most favorable to the jury's verdict, *Est. of Moreland*, 395 F.3d at 757.

The Supreme Court has identified three "guideposts" courts must consider when reviewing a punitive damages award. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). Those are: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* We consider this case under each.

### A. Reprehensibility

Of the three guideposts, reprehensibility "is the most significant factor." *Est. of Moreland*, 395 F.3d at 756 (citing *State Farm*, 538 U.S. at 419). Encompassing five considerations of its own, it includes whether:

> [T]he harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419. Each of the considerations—except financial vulnerability, which is irrelevant here—cuts in favor of leaving the jury's award in place.

To start, Titus both physically harmed Stewardson and showed a disregard for his health and safety. Shortly after Stewardson arrived at the Cass County Jail in handcuffs, Titus twice slammed his head against a wall, leaving him with an open wound over his left eye. Titus then helped move Stewardson to a cell where he immediately executed a leg sweep. Still handcuffed, Stewardson fell hard to the cell's floor. Later, Titus again employed excessive force. He opened the cell door directly into a then-naked Stewardson. Inside the cell, he executed a hip toss, throwing Stewardson to the floor once more. Titus's conduct was violent and thus all the more reprehensible. *See Gore*, 517 U.S. at 575–76. His actions were particularly troubling given he performed them as an officer holding a "position of public trust." *Kunz v. DeFelice*, 538 F.3d 667, 679

(7th Cir. 2008). "This court takes police brutality very seriously as grounds for punitive damages." *Id.* (citing *Cooper v. Casey*, 97 F.3d 914, 919 (7th Cir. 1996)).

In evaluating reprehensibility, courts also consider whether a defendant's conduct was isolated or repeated. *State Farm*, 538 U.S. at 419. From the head slams to the hip toss, Titus used excessive force on several occasions throughout the night. While each use of force was employed against Stewardson, this consideration requires repetition (employing force multiple times) not recidivism (employing force against multiple people). *See Saccameno*, 943 F.3d at 1087. Although "recidivism may often be more reprehensible" as a matter of degree, the jury understandably viewed Titus's conduct as reprehensible given its redundant nature. *Id.* So do we.

As for the last reprehensibility consideration, Titus's actions toward Stewardson were undoubtedly malicious. Viewing "the facts in the light most favorable to the verdict," his level of force exhibited an intent to harm Stewardson, rather than merely restrain him. *See Est. of Moreland*, 395 F.3d at 757. "To throw a man's head against concrete when he is handcuffed and presents no threat is clearly excessive and malicious." *Id.* Titus did more than just that. The jury also heard evidence that officers were laughing outside Stewardson's cell in the aftermath of Titus using excessive force. The district court judge, who observed Titus throughout the trial, described him as an unsympathetic witness who was "seemingly flippant" about the incident. All told, the evidence supported the jury's conclusion that Titus displayed a malicious disregard for Stewardson's well-being during and after the night in question.

Under these considerations, the first and most important guidepost counsels affirming the jury's punitive damages award.

**B. Ratio**

The second guidepost directs courts to compare "the actual or potential harm suffered by the plaintiff and the" jury's ultimate "punitive damages award." *State Farm*, 538 U.S. at 418 (citing *Gore*, 517 U.S. at 575).

Courts often evaluate this factor with reference to the "ratio between the compensatory and punitive damages." *Saccameno*, 943 F.3d at 1088. As a rule of thumb, an award that exceeds a single-digit ratio generally violates due process. *State Farm*, 538 U.S. at 425. But when a plaintiff receives a significant compensatory damages award, a lesser ratio might be more appropriate. *Id.* Conversely, a low compensatory damages award might justify a higher ratio. *Id.* The inquiry is ultimately context dependent and focuses on whether the damages correspond to the wrongfulness of the defendant's actions. *See Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 677–78 (7th Cir. 2003).

Recall that the jury awarded Stewardson $400,000 in compensatory damages and $850,000 in punitive damages. The resulting punitive to compensatory damages ratio is 2.1 to 1. So, as an initial matter, the award fails to raise any constitutional red flags. *Kapelanski v. Johnson*, 390 F.3d 525, 534 (7th Cir. 2004) (finding a ratio of 3.3 to 1 "easily permissible").

Titus nonetheless argues that the punitive damages award amounts to a windfall because Stewardson received a significant compensatory damages award. As explained, the amount of compensatory damages a plaintiff receives bears

on the punitive damages ceiling. But a substantial compensatory award does not foreclose a substantial punitive award. *See, e.g.*, *Est. of Moreland*, 395 F.3d at 751 (upholding substantial compensatory and punitive damages awards). While we acknowledge the size of the jury's punitive award in this case, Titus's actions justify it. When a defendant's conduct is sufficiently reprehensible it may "warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 575). Titus's repeated use of excessive force against Stewardson is worthy of deterrence. Moreover, courts are to compare the jury's punitive award to the actual *and* potential harm to the injured party. *Saccameno*, 943 F.3d at 1088 (citing *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 460–61 (1993)). Given the level of force Stewardson endured, one could imagine his injuries having been far more serious. The extent of possible harm further justifies deterrence.

Because the punitive damages award assessed against Titus appropriately corresponds to the severity of his conduct, the second guidepost points in favor of affirming the judgment.

### C. Comparable Cases

For the third and final guidepost, courts compare the punitive damages award at issue to "the civil penalties authorized or imposed in comparable cases." *Gore*, 517 U.S. at 575.

Titus argues at considerable length that the punitive damages award assessed against him exceeded those assessed against similarly situated defendants. As a threshold matter, "this guidepost generally deserves less weight than the other two." *Rainey v. Taylor*, 941 F.3d 243, 255 (7th Cir. 2019) (citing

*Kemp v. AT&T Co.*, 393 F.3d 1354, 1364 (11th Cir. 2004)). Courts should hesitate before disturbing a jury's award simply because it surpasses the size of awards distributed in other cases. *Id.* (quoting *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 238 (3d Cir. 2005)).

While we recognize that plaintiffs in other excessive force cases have received smaller awards than Stewardson's, this court has also refused to overturn much higher awards. In another § 1983 case, for example, a jury awarded $29 million in compensatory damages and $27.5 million in punitive damages against two officers. *Est. of Moreland*, 395 F.3d at 751. To be clear, the inmate there died, but the case otherwise bears several similarities to this one. *Id.* Police arrested Moreland for drunk driving. *Id.* Over the course of the evening, they subjected him to several rounds of excessive force. Police "roughed [Moreland] up repeatedly"—including by throwing his head against a wall, body slamming him, pepper spraying him, and leaving him in a puddle of his own spit and mucus. *Id.* at 757, 752. Officers looked on and laughed as the inmate suffered. *Id.* at 752. The court acknowledged that an award exceeding $25 million was "very large." *Id.* at 757. But because the compensatory to punitive damages ratio did "not test the limits of constitutionality," and because the conduct at hand was so reprehensible, it was unwilling to disturb the jury's award. *Id.*

Here, too, Titus's use of force was reprehensible and the damages ratio of 2.1 to 1 falls short of raising constitutional concerns. And while $850,000 is a significant punitive damages award, it is 32-fold smaller than the one upheld in *Estate of Moreland*. So, as in that case, we are unwilling to overturn

the jury's punitive damages award simply because Titus has identified smaller awards in other excessive force lawsuits.

Taken together, the Supreme Court's guideposts for evaluating whether a punitive damages award complies with due process counsel in favor of affirming the judgment against Titus. The award does not exceed what is constitutionally permissible.

### D. Titus's Ability to Pay

Moving beyond the guideposts, Titus argues his inability to pay Stewardson is a basis for reducing the jury's punitive damages award.

Titus currently makes less than $60,000 per year. Based on his salary, he submits that he will never be able to pay Stewardson $850,000. Titus's argument is well taken. A "defendant who cannot pay a large award of punitive damages can point this out to the jury …." *Kemezy v. Peters*, 79 F.3d 33, 36 (7th Cir. 1996). But Titus opted not to do so. As a matter of strategy, he was not required to make "[a] plea of poverty." *Id.* Having decided not to, though, he must now live with his choice. Because the burden rested on Titus to argue before the jury that his financial condition justified a smaller award, he cannot now ask us to alter the judgment based on his inability to pay. *See id.* (It is not "unjust to allow a jury to award punitive damages without knowing that the defendant really is [or is not] a wealthy person.").

Titus's financial position does not change our conclusion that the jury's punitive damages award falls below the constitutional ceiling.

### III. Cross-Appeal

On cross-appeal, Stewardson claims the district court erred in granting Biggs summary judgment based on qualified immunity. He seeks to move forward with his § 1983 claims against Biggs for allegedly (1) using excessive force by delivering two knee strikes against him, and (2) failing to intervene between Titus's leg sweep and subsequent hip toss. Stewardson also argues the district court improperly granted summary judgment on his *Monell* claim against the Sheriff of Cass County. He submits there is a triable issue of fact as to whether the Sheriff maintains an unconstitutional custom of stripping any uncooperative detainee that enters the Cass County Jail.

"We review de novo a district court's grant of summary judgment, viewing the facts in the light most favorable to the non-moving party." *Ludwig v. United States*, 21 F.4th 929, 931 (7th Cir. 2021) (citing *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 584 (7th Cir. 2021)). The "movant is entitled to judgment as a matter of law" upon a showing "that there is no genuine dispute as to any material fact." FED. R. CIV. P. 56(a).

### A. Biggs's Liability

Stewardson alleges Biggs used "objectively unreasonable" force in violation of the Fourteenth Amendment when he delivered two knee strikes in the padded cell. *See Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015). He also claims Biggs failed to intervene between Titus's leg sweep and hip toss, resulting in a deprivation of his constitutional rights. *See Montaño v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008). The

district court granted summary judgment on both claims after deciding that Biggs was entitled to qualified immunity.

So long as an officer's conduct does not violate clearly established law, qualified immunity will shield him from civil liability. *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017). The qualified immunity inquiry is twofold. It "requires the court to determine: (1) whether the record evidences the violation of a federal statutory or constitutional right; and if so (2) whether the right violated was clearly established at the time the violation occurred." *Schimandle v. Dekalb Cnty. Sheriff's Off.*, 114 F.4th 648, 655 (7th Cir. 2024) (citing cases). Before piercing an officer's immunity shield, a court must answer both steps of the inquiry in the affirmative. *Id.* But the Supreme Court has made clear that courts may proceed by evaluating the second prong of the analysis first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Kemp*, 877 F.3d at 351. Indeed, it is sometimes prudent for courts to begin with the second prong so as "to avoid 'unnecessary litigation of constitutional issues' and expending scarce judicial resources that ultimately do not impact the outcome of the case." *Kemp*, 877 F.3d at 351 (quoting *Pearson*, 555 U.S. at 236–37) (internal alteration omitted). Like the district court, we opt to begin our analysis at step two.

Stewardson "bears the burden of demonstrating that the" rights at issue were "clearly established at the time the alleged violation[s] occurred." *Schimandle*, 114 F.4th at 655 (citing *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017)). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). To reach

a point of clarity, "[e]xisting precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Although Stewardson need not identify a case directly on point, relevant precedent—viewed at the appropriate level of generality—must put to rest any question that Biggs should have known he was violating the law. *Mullenix*, 577 U.S. at 11–12; *Schimandle*, 114 F.4th at 655; *Kemp*, 877 F.3d at 351.

### 1. *Excessive Force*

On his first claim, Stewardson bears the burden of showing that every reasonable official in Biggs's position would have known it was unlawful to execute two knee strikes under the circumstances in the padded cell. *See Kemp*, 877 F.3d at 351. That is, that the knee strikes amounted to an objectively unreasonable use of force under the Fourteenth Amendment. *See Kingsley*, 576 U.S. at 396–97.

Recall, Stewardson was either partially handcuffed or entirely uncuffed and resisting officers at the time Biggs delivered the knee strikes. Video confirms this. And Stewardson admitted as much during his deposition. When an individual resists police, Stewardson concedes that an officer may use reasonable force to subdue him. *Kingsley*, 576 U.S. at 397 (courts evaluating the reasonableness of force consider "whether the plaintiff was actively resisting"). Police are also entitled to use reasonable force to neutralize a potential threat. *See id.*

As the district court observed, when Stewardson was only partially handcuffed, he was a risk to officer safety, as the handcuffs became a potential weapon. He also posed a threat to officers while he was unhandcuffed and resisting. Given

these realities, Stewardson cannot reasonably argue Biggs was barred from using force. Instead, he contends Biggs violated his rights by executing maximum-force knee strikes. We pause to note that Stewardson bases his argument on Biggs's deposition testimony where he answered "[y]es" to whether he delivers knee strikes "with all [his] available strength[.]" But in that portion of his deposition, Biggs was describing how he was trained to properly execute a knee strike, not how he executed the knee strikes against Stewardson. Nonetheless, we will proceed under the assumption that Biggs delivered maximum-force knee strikes that night.

The relevant question, then, is whether the law at the time clearly established that an officer in Biggs's position should have known to employ less-than-maximum-force knee strikes as opposed to maximum-force knee strikes. On this point, Stewardson offers no analogous precedent. He cites cases standing for the broad proposition that "the amount of force" an officer uses "bears directly on whether that force was a reasonable response to the situation." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010). True enough, but Stewardson is too far up the ladder of generality. *Cyrus* did not put Biggs on notice that he was required to quickly assess Stewardson's level of restraint and then determine whether a knee strike at 50%, 75%, or 100% force was sufficiently calibrated to avoid violating his constitutional rights. And it certainly did not put Biggs on notice that, under the circumstances, it was appropriate to disregard his training on how to employ a knee strike.

If anything, the law as it existed when Biggs delivered the knee strikes would have led a reasonable officer to conclude the force used against Stewardson was appropriate. The most

analogous case we have found is *Rudlaff v. Gillispie*, 791 F.3d 638 (6th Cir. 2015). There, the Sixth Circuit held that it was not excessive force for officers to neutralize an actively resisting arrestee with a "one-time taser shot and knee strike." *Id.* at 643. Like Stewardson, the arrestee in that case was "verbally defiant" and physically non-compliant. *Id.* at 642. Under those "tense, uncertain, and rapidly evolving" circumstances, the court thought a knee strike perfectly reasonable to subdue resistance. *Id.* at 643 (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). And, in reaching its conclusion, the court did not distinguish between maximum-force and less-than-maximum-force knee strikes. *Id.*; *see also Smith v. Ball State Univ.*, 295 F.3d 763, 771 (7th Cir. 2002) (attempted knee strike resulting in a tackle deemed reasonable); *Pullen v. House*, 88 F. Supp. 3d 927, 943 (W.D. Wis. 2015).

Stewardson falls short of showing that every reasonable officer in Biggs's position would have known that his knee strikes amounted to a violation of clearly established law. Biggs therefore has qualified immunity from Stewardson's excessive force claim.

### 2. *Failure to Intervene*

Stewardson next claims that Biggs violated his constitutional rights by failing to intervene between Titus's leg sweep and hip toss. "[A]n officer has a duty under § 1983 to 'intervene to prevent … the use of excessive force if the officer is informed of the facts that establish a constitutional violation and has the ability to prevent it.'" *Montaño*, 535 F.3d at 569 (quoting *Morfin v. City of East Chicago*, 349 F.3d 989, 1001 (7th Cir. 2003)). Biggs is entitled to qualified immunity unless Stewardson can show the law clearly established that he was

legally obligated to prevent Titus's hip toss. *See Mullenix*, 577 U.S. at 11–12.

Importantly, although Biggs was at the Cass County Jail, he was not physically present in the padded cell when Titus executed the hip toss against Stewardson. On that point, the parties agree. Even so, Stewardson argues Biggs should have cautioned Titus against using additional excessive force after witnessing prior instances of force that night—most recently, the leg sweep that occurred about thirty minutes prior. The relevant question for purposes of qualified immunity, then, is whether an officer—who previously witnessed another officer's use of excessive force—should have known he was obligated to prevent additional excessive force that occurred later in time and outside of his presence. The law was, and remains, unclear on that question.

Stewardson argues *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467 (7th Cir. 1997), provides clarity. There, the court dismissed a failure-to-intervene claim against a police chief who witnessed one of his officers "poke and push" an individual. *Id.* at 478. The court held that the chief had no opportunity to prevent an isolated incident like this. *Id.* It went on to provide a hypothetical, saying "had he felt that further physical force might ensue," the chief "certainly could have intervened." *Id.* But *Lanigan* does little to clarify the law in this area. The chief may have had an obligation to intervene if he witnessed a second poke and push, as they were about to happen right after the first. In other words, if he witnessed ongoing force. But the case does not stand for the proposition that the chief would have been obligated to prevent another sudden incident half an hour later and out of his view. Stewardson's reliance on *Lanigan* is thus misplaced. Titus's excessive force was

not ongoing. Rather, thirty minutes separated the leg sweep and the hip toss. Biggs, who was in another room, did not have a realistic opportunity to prevent the latter use of force while it was being committed. *See Chavez v. Ill. State Police*, 251 F.3d 612, 652 (7th Cir. 2001).

Stewardson also cites this court's statement in *Byrd v. Brishke* that "a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge." 466 F.2d 6, 11 (7th Cir. 1972). According to Stewardson, the "otherwise within his knowledge" language from *Byrd* makes clear that Biggs was legally required to intervene prior to Titus's hip toss, as he had already witnessed Titus use force that night. But Stewardson puts more weight on that phrase than it can hold. The court in *Byrd* dealt with a factual scenario where the plaintiff "was beaten by unknown officers *in the[] presence*" of the defendant-officers. 466 F.2d at 11 (emphasis added); *see also id.* (the "responsibility [to intervene] must exist as to nonsupervisory officers *who are present at the scene* of such summary punishment") (emphasis added). Like *Lanigan*, *Byrd* does not say that one officer must predict that another officer will later use force outside of his presence and prevent him from doing so.[†]

---

[†] The partial dissent repeatedly refers to the "or otherwise within his knowledge" language in *Byrd* as forming part of that case's "holding." We respectfully disagree. That language was not necessary to the outcome of *Byrd*. As explained, the officers there were present to witness the beating at issue and, on account of their presence, had a realistic opportunity to intervene. *Byrd*, 466 F.2d at 11. The court in *Byrd* had no occasion to

The law does not require officers to act as fortune tellers, anticipating when their fellow officers might use excessive force in the future and knowing to intervene before they do. We do not think the court in *Byrd* meant to impose such a duty when it said failure-to-intervene liability might attach when an officer fails to prevent excessive force "within his knowledge." *Id.* Stewardson fails to cite a case that clearly establishes such a rule, and our search reveals none.

Biggs is therefore entitled to qualified immunity on Stewardson's failure-to-intervene claim. Nothing indicates Biggs had "the ability to prevent" Titus's sudden use of additional force when it occurred outside of his presence and some thirty minutes after the leg sweep. *Montaño*, 535 F.3d at 569 (quoting

---

determine under what circumstances knowledge alone would trigger a duty to intervene.

That is crucial for purposes of qualified immunity. Again, our task is to determine whether every reasonable officer in Biggs's position would have known he was violating Stewardson's constitutional rights by failing to predict and prevent Titus's sudden use of additional force—force that occurred thirty minutes after the leg sweep. It is possible to imagine scenarios in which Biggs may have had a duty to intervene. Consider, for example, if Titus confessed his violent plan to a third officer, who then reported Titus to Biggs. In that hypothetical, Biggs may have a duty to intervene before Titus carried out his plan. But hypotheticals are not enough for legal principle to be clearly established. A rule must be more than merely "suggested by then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).

The partial dissent correctly points out that "many of the failure-to-intervene fact patterns our court has confronted involve an officer who was present when another officer violates the Constitution." That explains why neither Stewardson nor our dissenting colleague have identified a single factually analogous case putting Biggs on notice that he had to both foresee Titus's abrupt use of force and caution him before it transpired.

*Morfin*, 349 F.3d at 1001). Because the law at the time imposed no clear duty on an officer to intervene under the circumstances presented in this case, the district court correctly granted summary judgment to Biggs.

### B. *Monell* Liability

Last, Stewardson appeals the district court's grant of summary judgment to the Sheriff of Cass County on his *Monell* liability claim.

A municipal entity "can be liable under § 1983 only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019) (quoting *Monell*, 436 U.S. at 694). Aside from showing he was deprived of a federal right, to succeed on a *Monell* claim, a plaintiff must show: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id.* (quoting *Est. of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007)).

Stewardson alleges the Cass County Jail maintains a custom that deprives inmates of their federal rights—the second type of *Monell* claim above. Specifically, he says the Jail has a custom of unlawfully stripping and restraining to a chair all uncooperative detainees.

"*Monell* claims," like Stewardson's, "based on allegations of an unconstitutional municipal practice or custom—as distinct from an official policy—normally require evidence that

the identified practice or custom caused multiple injuries." *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016). Fatal to Stewardson's claim, he has not identified any other instances where inmates in the Cass County Jail were stripped naked as punishment for being uncooperative. And this is not "one of those rare cases" where "the possibility of harm from a custom or practice may be so obvious" that the plaintiff need not produce evidence of other injuries. *Id.* (citing *Calhoun v. Ramsey*, 408 F.3d 375, 381 (7th Cir. 2005)). The possibility of harm is not so obvious here, given that strip searches at jails are permissible under certain circumstances. *See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 330 (2012). Not only that, but jails also sometimes remove clothing from inmates who pose a risk of suicide. *See, e.g.*, *Myers v. County of Lake*, 30 F.3d 847, 850 (7th Cir. 1994).

Stewardson has thus failed to offer sufficient evidence to overcome summary judgment on his *Monell* custom claim.

### IV. Conclusion

A jury assessed a punitive damages award against Titus that falls within the constitutionally permissible range. We therefore AFFIRM that judgment. And because Biggs did not violate clearly established law when he delivered two knee strikes or when he failed to prevent Titus's final use of force against Stewardson, he is entitled to qualified immunity. In addition, Stewardson has not offered sufficient evidence to proceed against the Sheriff of Cass County on a theory of *Monell* liability. Accordingly, we AFFIRM the district court's decisions granting Biggs and the Sheriff summary judgment.

JACKSON-AKIWUMI, *Circuit Judge,* dissenting in part. I dissent only as to the grant of qualified immunity to Officer Biggs on Blake Stewardson's claim that Biggs failed to intervene before Officer Titus performed a hip toss on Stewardson. In my view, we should reverse the district court's decision to shield Biggs from this claim. I join the majority opinion's resolution of all other issues.

In *Byrd v. Brishke*, our court espoused as clearly established law: "[O]ne who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence <u>or</u> otherwise within his knowledge." 466 F.2d 6, 11 (7th Cir. 1972) (emphasis added). Other circuits have regarded *Byrd* as the "leading case on the duty to intervene." *See Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986); *Rascon v. Hardiman*, 803 F.2d 269, 276 (7th Cir. 1986) (listing cases). As I see it, the majority opinion sweeps aside the second half of *Byrd*'s holding: that an officer has a duty to prevent other officers from punishing someone when that punishment is "otherwise within his knowledge." 466 F.2d at 11.

The majority opinion takes the position that Biggs had no duty to intervene because he was not present when Titus performed the hip toss on Stewardson. *See ante*, at 21. This view narrows our holding in *Byrd* and overlooks a related precept our caselaw has reaffirmed over time: an officer must be "informed of the facts that establish a constitutional violation and [have] the ability to prevent it." *Montaño v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008) (citation omitted); *see also Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). In other words, presence is not necessary for a duty to intervene to arise. The holdings of *Byrd*, *Montaño*, and the like remain our governing

law even if many of the failure-to-intervene fact patterns our court has confronted involve an officer who was present when another officer violates the Constitution.

Our circuit has also instructed: "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Lanigan v. Vill. of E. Hazel Crest*, 110 F.3d 467, 474, 478 (7th Cir. 1997) (citation omitted) (finding no opportunity to intervene existed because the force—"one violent poke and push"—was not "so prolonged" for the officer to have "undertaken any action to 'undo'" another officer's constitutional violation); *Miller v. Gonzalez*, 761 F.3d 822, 826 (7th Cir. 2014) (same as to an officer who did not see a fellow officer until he was "flying over [a] fence" and had "no time to act until after" the jumping officer had already landed on the arrestee's jaw). We do not need a case "directly on point" for a right to be clearly established. *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011). Instead, the question before us is whether a reasonable jury could find that Biggs knew of the constitutional violation, was capable of intervening, and was reckless or deliberately indifferent in failing to do so. *Cf. Yang*, 37 F.3d at 285 n.1 (continuing to apply *Byrd*'s duty to intervene reasoning but requiring, after *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986), "proof that a government official acted with intentional disregard" rather than mere negligence as in *Byrd*). I believe a reasonable jury could find all the above.

For one, the fact that Biggs was not in the cell at the time of Titus's hip toss did not erase the knowledge that Biggs had accumulated since Stewardson's arrival at the jail: Titus was

subjecting Stewardson to "repeated use of excessive force," as
my colleagues aptly describe it. *Ante*, at 11. Biggs saw Titus
slam Stewardson's head into the wall twice and perform a leg
sweep on him. Even if Titus's leg sweep and hip toss hap-
pened thirty minutes apart, Biggs knew Titus had been mis-
treating Stewardson. Further, thirty minutes is not a long
time. This is especially true in a county jail where, as surveil-
lance video shows, several officers were solely focused on this
one detainee in an ongoing effort to stabilize him. A reasona-
ble jury could thus conclude Biggs knew of the constitutional
violation.

Based on Biggs's knowledge, a reasonable jury could also
find that he was reckless for not intervening. At the very least,
a reasonable jury could conclude that Biggs—a supervisor no
less—should have reminded Titus that this detainee was
drunk and possibly suicidal. And if Titus somehow feared for
his safety before entering Stewardson's cell, Biggs could have
urged Titus to wait for other officers to accompany him. Such
warnings are within the realm of officers' intervention mech-
anisms to prevent further constitutional violations. *See Abdul-
lahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) ("At the
least, a reasonable jury might conclude (if the plaintiff's the-
ory of the case is credited) that the other officers should have
cautioned [the officer] to stop kneeling on [the arrestee's]
back."); *Miller v. Gonzalez*, 761 F.3d 822, 826 (7th Cir. 2014) ("A
'realistic opportunity' means a chance to warn the officer us-
ing excessive force to stop."); *Yang*, 37 F.3d at 285 ("At a min-
imum [the officer] could have called for a backup, called for
help, or at least cautioned [his fellow officer] to stop."); *see also
Stabenow v. City of Eau Claire*, 546 F. Supp. 3d 787, 799 (W.D.
Wis. 2021) ("But circuit law doesn't require [a plaintiff] to
show that the officers had the ability to *physically* stop

[another officer]. Rather, all that [a plaintiff] must show is that they had the ability to tell [the other officer] to stop.").

Recall when the hip toss happened. Biggs saw, through the security camera, Stewardson unsuccessfully attempt to cover the cell's camera. So Biggs instructed officers to go into the cell and place Stewardson in a restraint chair. Titus approached the cell before the restraint chair and his fellow officers arrived, and he performed the hip toss upon entering. This was not a heat of the moment situation where Biggs had to deploy Titus to the cell immediately and had no time to prevent the hip toss. *See Lanigan,* 110 F.3d at 478. Stewardson's several attempts to cover the camera were unsuccessful, so officers could have continued to monitor Stewardson through the security camera or his cell window before anyone entered the cell for the restraint chair placement. Given this, a reasonable jury could find that a brief word of caution from Biggs might have prevented Titus's hip toss. After all, Biggs was just steps away from both Titus and Stewardson's cell. He had ample opportunity—a reasonable jury could conclude—to warn Titus about excessive force before the officers had to physically interact with Stewardson again.

As a final note, the majority opinion cites *Chavez v. Illinois State Police*, 251 F.3d 612, 652 (7th Cir. 2001), in support of its conclusion. But that case is inapposite. *Chavez* involved a statewide drug interdiction program alleged to have caused disproportionate traffic stops of African American and Hispanic motorists. *Id.* at 620–21, 626. The plaintiffs were a Hispanic motorist and an African American motorist stopped in 1992 and 1993, respectively. *Id.* at 623–25. They alleged that, from 1990 to 1994, a sergeant had reviewed statistics showing the racial disparity for his district, failed to maintain

statewide statistics after being promoted to program coordinator for the entire state, and consequently failed to intervene in the constitutional violations. *Id.* at 651–52. Our court disagreed with the plaintiffs' theory on the basis that there was no proof of a constitutional violation. *Id.* In dicta, we noted "even if there had been a constitutional violation, [the sergeant] would not have been present and thus would have been unable to intervene, rendering him not liable." *Id.* at 652. Dicta aside, it is not clear whether our reference to the sergeant's presence meant that he was not physically present for the traffic stops or that he had not assumed the coordinator position until after the stops at issue. In any event, *Chavez*'s facts are far removed from the knowledge Biggs undisputedly acquired (knowledge of Titus's repeated violence) and the intervention that might have sufficed (a simple warning).

In sum, it would not take a "fortune teller," to use the majority opinion's term, to foresee that Titus's use of excessive force would persist. *Ante*, at 21. Our clearly established law does not condone an officer's decision to turn a blind eye to that sort of recurring conduct. Because the question of whether Biggs failed to intervene should have gone to a jury, I respectfully dissent.