In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1314

LARRY KEMP, *et al.*,

*Plaintiffs-Appellants*,

*v.*

DAVID LIEBEL,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division
No. 1:14-cv-1728 — **Sarah Evans Barker**, *Judge*.

ARGUED OCTOBER 26, 2017 — DECIDED DECEMBER 11, 2017

Before FLAUM, RIPPLE, and MANION, *Circuit Judges*.

FLAUM, *Circuit Judge*. Plaintiffs Larry Kemp and Brian
Woodring were Jewish inmates at prisons operated by the In-
diana Department of Corrections ("DOC").[1] In 2014, Kemp
and Woodring were transferred from one DOC facility to an-
other in order to maintain a kosher diet. Plaintiffs allege that

---

[1] Kemp was released from the DOC on June 15, 2016.

defendant David Liebel, the DOC Director of Religious and
Volunteer Services, violated the Free Exercise Clause of the
First Amendment by failing to delay that transfer until the
new facility offered opportunities for Jewish group worship
and study. On cross motions for summary judgment, the dis-
trict court found for Liebel on the ground that plaintiffs failed
to overcome Liebel's qualified immunity defense. We affirm.

## I. Background

The factual background is mostly undisputed. Plaintiffs
Kemp and Woodring were prisoners at Pendleton Correc-
tional Facility ("Pendleton") until April 2014, when they were
transferred to Wabash Valley Correctional Facility ("Wabash
Valley") in order to maintain a kosher diet. Defendant Liebel
is the DOC Director of Religious and Volunteer Services. In
that role, he is responsible for establishing religious program-
ming, managing religious services, setting guidelines for reli-
gious group meetings, and maintaining the DOC Handbook
of Religious Belief and Practices.[2] Liebel is not, however, in-
volved in the operation of day-to-day activities at DOC facili-
ties. For instance, he does not directly supervise chaplains or
decide whether a group can meet for services or study.

The DOC maintains a general policy regarding religious
services and study: recognized religious groups are permitted
to participate in one hour of group worship and one hour of
group study each week. The DOC mandates that group wor-
ship and study be supervised by chaplains, religious special-
ists, or qualified volunteers in order to maintain the "integrity

---

[2] The DOC Handbook of Religious Beliefs and Practices recognizes that
group worship is an important facet of Judaism, especially on Shabbat, a
weekly holy day observed from sunset Friday until sunset Saturday.

and authenticity of beliefs and practice." If an outside leader is unavailable, inmates are permitted to lead group services only if certain conditions are met. First, an outside religious authority must explain to a DOC chaplain how the service is run and certify that the inmate-leader has requisite knowledge to lead the service. Second, the inmate-leader must be qualified by the DOC facility. Finally, a DOC chaplain must supervise the meeting.

While the DOC employs chaplains at its facilities to lead Christian services, it does not employ leaders of other religions, including Judaism. Instead, the DOC contracts with Lubavitch of Indiana, an Orthodox Jewish group. Lubavitch rabbis visit some DOC facilities—including Pendleton but not Wabash Valley—once a month to lead services and study and to certify inmate leaders. Thus, while at Pendleton, Kemp and Woodring attended group services and study each week. However, Wabash Valley could not offer any group services, including inmate-led services, because no volunteers were available.

Inmates at DOC facilities can also keep a kosher diet, both for religious and non-religious reasons. Until 2013, kosher meals were provided exclusively in pre-packaged form, and were about four times more expensive than regular meals. In 2013, in order to centralize kosher food production and reduce costs, the DOC initiated a plan to create kosher kitchens at four of its facilities. The plan included Wabash Valley but not Pendleton. The locations were chosen based on physical amenities, availability of Aramark staff (the contracted food provider), and security level. Liebel did not choose the kosher kitchen facilities, but was involved in the project; for example, he objected to opening the kitchens in

December 2013 because they had not been certified as kosher and he did not want to open them during Hanukkah. Although the record is not clear about the exact cost of kosher meals, both parties agree that the kosher kitchen project was developed in order to provide kosher meals at a lower cost compared to providing pre-packaged kosher meals.[3]

In late 2013, the DOC determined that all inmates who kept kosher would be housed at facilities with the new kitchens. Kosher inmates at Pendleton received a notice from Liebel informing them they would be transferred to accommodate their diet. They were given the option, however, of forgoing kosher food in order to remain at Pendleton. Some inmates took that option, while others, including Kemp and Woodring, accepted the transfer. Liebel provided Jack Hendrix, the DOC's executive director of classification, with a list of inmates to be moved. Hendrix, and not Liebel, chose which kosher kitchen facility inmates would be transferred to; the decision was based on a variety of factors, including security, medical and mental health, programming, and other prisoner needs. Liebel did, however, have the ability to request that an inmate's transfer be delayed, and he was aware Wabash Valley

---

[3] In their briefing, plaintiffs introduced a publicly available contract addendum between the DOC and Aramark. *See* Amendment #16, EDS #D12-6-02 (2013), at 149, https://fs.gmis.in.gov/IDOAcontracts/public/451-020.pdf. According to that document, Aramark agreed to prepare kosher meals for the DOC at the same cost as regular meals. *Id.* This document suggests that all kosher meals—whether pre-packaged or made in a kosher kitchen—cost the same. However, the addendum, with an effective date of December 1, 2013, was specifically agreed to in contemplation of opening the new kosher kitchens. It was based on the assumption that nearly all kosher meals would be made in the kosher kitchens at a lower cost.

did not offer congregate Jewish services or study at the time of the proposed transfer.

Eventually, a rabbi certified the new kitchens as kosher, and in April 2014, the DOC transferred about twenty kosher inmates from Pendleton to facilities with kosher kitchens. Kemp and Woodring were moved to Wabash Valley. At least three inmates remained at Pendleton and continued to receive pre-packaged kosher meals. The transfer of these individuals was postponed because at that time, they lived in special housing for non-religious reasons. For example, they had restrictive housing status, required mental health treatment, or lived in special housing for disciplinary reasons. Eventually, these inmates were also moved, though at least one inmate resided at Pendleton and receive pre-packaged kosher meals until December 2014.

At the time of the transfer, the DOC was unable to recruit Jewish volunteers to Wabash Valley to lead worship or train inmate leaders; therefore, no Jewish services or group study were available. Liebel was aware that inmates, including Kemp and Woodring, made requests for worship and study. He made a concerted effort to locate Jewish volunteers to set up services and certify inmates. The DOC called Jewish synagogues in the area, and Liebel met personally with a rabbi. However, these efforts were unsuccessful until January 2015, when a Jewish leader came to Wabash Valley and certified inmates, including Kemp, to become leaders.[4] Ever since, Wabash Valley has offered congregate Jewish services and study.

---

[4] Wabash Valley did permit an inmate to lead a Passover gathering in April 2014. And in December 2014, a Messianic Jewish rabbi visited Wabash Valley, led a service, and qualified two inmates to lead Messianic

On October 22, 2014, after exhausting all administrative remedies, Kemp and Woodring filed a complaint seeking declaratory relief, injunctive relief, and damages against the Commissioner of the DOC in his official capacity, the Chaplain of Wabash Valley in his official capacity, and Liebel, in both his official and individual capacity. They asserted claims pursuant to 42 U.S.C. § 1983 for an alleged violation of the Free Exercise Clause of the First Amendment, and 42 U.S.C. § 2000cc, *et seq.*, the Religious Land Use and Institutionalized Persons Act. On October 20, 2015, plaintiffs moved for partial summary judgment on the issue of liability and conceded that their claims for declaratory and injunctive relief were moot because Wabash Valley started offering congregate Jewish services and study. On December 18, 2015, Liebel filed a cross-motion for summary judgment. One week later, plaintiffs dismissed their official capacity claims against the DOC Commissioner, the Wabash Valley Chaplain, and Liebel. On January 20, 2017, the district court granted Liebel's motion for summary judgment, holding that Liebel was entitled to qualified immunity. This appeal followed.

## II. Discussion

"We review de novo a district court's decision on cross-motions for summary judgment, construing all facts and drawing all reasonable inferences in favor of the party against whom the motion under consideration was filed." *Hess v. Bd. Of Trs. Of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016). "Sum-

---

Jewish services. Messianic Jewish services, however, are not traditional services, and Messianic Judaism is generally considered to be a variant of Christianity, separate from Judaism.

mary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Id.* (citing Fed R. Civ. P. 56(a)). Likewise, we review de novo a district court's grant of qualified immunity. *Green v. Newport*, 868 F.3d 629, 632 (7th Cir. 2017).

### A. The Doctrine of Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "The defense provides ample room for mistaken judgments and protects all but the plainly incompetent and those who knowingly violate the law." *Green*, 868 F.3d at 633 (quoting *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008)).

A state official is protected by qualified immunity unless the plaintiff shows: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow*, 457 U.S. at 818). In order to avoid "[u]nnecessary litigation of constitutional issues" and expending scarce judicial resources that ultimately do not impact the outcome of the case, we may analyze the "clearly established" prong without first considering whether the alleged constitutional right was violated. *Pearson*, 555 U.S. at 236–37. We take that approach here.

### B.  The Relevant "Clearly Established Law" Inquiry

To defeat Liebel's qualified immunity defense, the burden is on plaintiffs to demonstrate that the alleged violation of their Free Exercise Clause right was "clearly established." *See Green*, 868 F.3d at 633. "To be clearly established at the time of the challenged conduct, the right's contours must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right … ." *Gustafson v. Adkins*, 803 F.3d 883, 891 (7th Cir. 2015) (quoting *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013)). "[T]he crucial question [is] whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014).

Plaintiffs need not point to an identical case finding the alleged violation unlawful, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *al-Kidd*, 563 U.S. at 741). "[W]e look first to controlling Supreme Court precedent and our own circuit decisions on the issue." *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000). If no controlling precedent exists, "we broaden our survey to include all relevant caselaw in order to determine 'whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Id.* (quoting *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir. 1989)). In the absence of controlling or persuasive authority, plaintiffs can demonstrate clearly established law by proving that the defendant's conduct was "so egregious and unreasonable that … no reasonable [official] could have thought he was acting lawfully." *Abbott v. Sangamon County, Illinois*,

705 F.3d 706, 724 (7th Cir. 2013); *see also Jacobs*, 215 F.3d at 767 ("In some rare cases, where the constitutional violation is patently obvious, the plaintiffs may not be required to present the court with any analogous cases … .").

Before we can determine if the law was clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). "The Supreme Court has 'repeatedly told courts … not to define clearly established law at a high level of generality.'" *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013) (alteration in original) (quoting *al-Kidd*, 563 U.S. at 742); *see, e.g., White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam); *Mullenix*, 136 S. Ct. at 308; *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015). Instead, "[t]he dispositive question is 'whether the volatile nature of *particular* conduct is clearly established.'" *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742). In other words, "the clearly established law must be 'particularized' to the facts of the case." *White*, 137 S. Ct. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Volkman*, 736 F.3d at 1090 ("[T]he Seventh Circuit has long held that 'the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted.'" (quoting *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987))).

The Supreme Court has expressly rejected over-general formulations of clearly established law in the Fourth Amendment context. In *Graham v. Connor*, 490 U.S. 386 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985), the Court created a reasonableness test for determining whether excessive force is contrary to the Fourth Amendment. *See Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (per curiam). This test made clear that

officers' use of excessive force violates the Fourth Amendment if it is objectively unreasonable. *Id.* In recent years, the Court has repeatedly stressed that *Graham* and *Garner* "lay out excessive-force principles at only a general level." *White*, 137 S. Ct. at 552. The Court reasoned that general statements of law can only give "'fair and clear warning' to officers" if the unlawfulness is apparent based on pre-existing law. *Id.* (quoting *United States v. Lanier,* 520 U.S. 259, 271 (1997)). Thus, the Court held that "*Garner* and *Graham* do not by themselves create clearly established law outside 'an obvious case.'" *Id.* (quoting *Brosseau*, 543 U.S. at 199).

Here, plaintiffs ask us to define the relevant clearly established law as "the right of prisoners not to have their religious practices interfered with and prevented absent a legitimate penological basis." This formulation is too broad. In fact, it simply restates the standard for analyzing prisoners' constitutional claims created by the Court in *Turner v. Safley*, 482 U.S. 78 (1987). There, the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89.[5] Just as *Garner* and *Graham* create a generalized excessive force standard, *Turner* creates a generalized

---

[5] This determination depends on four factors:

> (1) whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule; (2) whether there are alternative means of exercising the right in question; (3) what impact accommodation of the asserted constitutional right would have on guards, other inmates, and on the allocation of prison resources; and (4) what easy alternatives exist to the regulation because, although the regulation need not satisfy

framework to analyze prisoners' constitutional claims. Both describe a multi-factor reasonableness test used to determine whether a defendant's actions violated the Constitution. Thus, like the *Garner* and *Graham* standard, the *Turner* test cannot create clearly established law outside an obvious case.[6] Instead, as the district court stated, the proper inquiry is

---

a least restrictive alternative test, the existence of obvious alternatives may be evidence that the regulation is not reasonable.

*Shimer v. Washington*, 100 F.3d 506, 509 (7th Cir. 1996) (citing *Turner*, 482 U.S. at 89–90).

[6] Plaintiffs point to several cases where they contend we used a more general clearly established law inquiry. These cases are distinguishable. First, in *Conyers v. Abitz*, an inmate was denied late dinners during Ramadan, when Muslims cannot eat from dawn to dusk. 416 F.3d 580, 582 (7th Cir. 2005). We described the relevant inquiry as whether "the law was clearly established that prison officials must have a legitimate penological interest before imposing a substantial burden on the free exercise of an inmate's religion." *Id.* at 586. Critically, however, in holding the defendant was not entitled to qualified immunity, we cited specific examples of courts finding Free Exercise Clause violations when prison polices did not accommodate religious dietary needs. *Id.* In contrast, no such precedent exists here. Second, in *Williams v. Lane*, a prison official denied protective-custody inmates the ability to participate in group worship even though general-population inmates were permitted to attend religious group services. 851 F.2d 867, 873–74 (7th Cir. 1988). We held defendants were not entitled to qualified immunity because they "fail[ed] to demonstrate a legitimate rationale justifying their deprivation of rights of these protective custody inmates." *Id.* at 883. But *Williams* was not a typical case. Indeed as my concurrence recognized, "[t]he defendants' litigation strategy … dictated the outcome" and resulted in affording "rights which [were] not necessarily indicated by … Supreme Court precedent." *Id.* at 885–86 (Flaum, J., concurring in the result) (suggesting that "plaintiffs' success on their [First Amendment] claim[] was far from inevitable"). Finally, in *Grayson v. Schuler*, a prison official forced an inmate to cut his dreadlocks. 666 F.3d 450, 451 (7th Cir. 2012). We recognized that a ban on long hair ordinarily

whether there existed a "clearly established constitutional right on the part of prisoners to congregate services and study absent appropriate leadership and supervision at the time of an interfacility transfer." *Kemp v. Liebel*, 229 F. Supp. 3d 828, 836 (S.D. Ind. 2017).

## C. Liebel Did Not Violate Clearly Established Law

Under this framework, it is clear that Liebel is protected by qualified immunity. Plaintiffs cite no case where we held that the Free Exercise Clause provides prisoners the right to group worship when outside volunteers were unavailable to lead or train inmates. Likewise, they cite no case where we held that a prison official violates the Free Exercise Clause by transferring inmates to a facility that does not provide congregate worship and study, or by failing to delay a transfer until the new facility provides congregate worship and study.[7]

---

"would pass constitutional muster." *Id.* at 452. However, we concluded this particular order was unreasonable because it was based on the "Rastafarian exception," which allowed Rastafarian prisoners, but not prisoners of other religions, to wear dreadlocks. *Id.* at 453. We thus held the defendant was not entitled to qualified immunity because a reasonable official could not believe the plaintiff was insincere in his religious beliefs or that only Rastafarians could wear dreadlocks without posing a security threat. *Id.* at 454–55. We did not use a broad clearly established law inquiry, but instead determined that the policy was so egregious and unreasonable that it "could not reasonably be thought constitutional." *Id.* at 455.

[7] Plaintiffs cite only to *Thompson v. Holm*, 809 F.3d 376 (7th Cir. 2016). In *Thompson*, a Muslim prisoner was denied meal bags during Ramadan. *Id.* at 378. We denied defendants' qualified immunity claim, noting that "we have held that 'a prisoner's religious dietary practice is substantially burdened when the prison forces him to choose between his religious practice and adequate nutrition.'" *Id.* at 381 (quoting *Nelson v. Miller*, 570 F.3d 868,

Indeed, our precedent suggests that prison officials "need not … allow inmates to conduct their own religious services" so long as the delay in offering services by qualified leaders is reasonable. *Johnson-Bey v. Lane*, 863 F.2d 1308, 1310–11 (7th Cir. 1988); *see also Hadi v. Horn*, 830 F.2d 779, 784–87 (7th Cir. 1987).[8] Other circuits have reached similar conclusions. *See, e.g.*, *Baranowski v. Hart*, 486 F.3d 112, 120–22 (5th Cir. 2007); *Spies v. Voinovich*, 173 F.3d 398, 405–06 (6th Cir. 1999); *Anderson v. Angelone*, 123 F.3d 1197, 1198–99 (9th Cir. 1997); *Tisdale v.*

---

879 (7th Cir. 2009)). Plaintiffs contend that Liebel imposed a similarly burdensome choice: staying at Pendleton to attend group services but losing a kosher diet, or accepting a transfer to Wabash Valley to keep a kosher diet but losing the ability to attend services. We disagree. Although we held in *Thompson* that a prisoner's right to maintain a religious diet (as opposed to starving) is clearly established law, we said nothing about the right to attend group worship. Simply put, *Thompson* did not in any way clearly establish that Liebel violated the Free Exercise Clause here.

[8] In *Hadi*, we applied the *Turner* factors and determined that each favored the defendant: (1) barring unsupervised services furthered legitimate interests in ensuring adequate prison security, avoiding inmate conflict, and preventing the formation or recognition of a leadership hierarchy; (2) plaintiffs had alternative means of exercising the right, as the prison employed a full-time Muslim chaplain and prisoners could attend weekly study classes; (3) allowing unsupervised religious services would mandate unsupervised services for other religious groups, compounding the security concerns; and (4) no alternative outside a ban on unsupervised services would dispel the security concerns underlying the policy. 830 F.2d at 784–87. In *Johnson-Bey*, we cited *Hadi*'s concern that allowing inmates to conduct their own religious services could "foment conspiracies" and "create (though more likely merely recognize) a leadership hierarchy among the prisoners." 863 F.2d at 1310. We clarified, however, that prisons may not "place arbitrary obstacles in the way of inmates seeking to participate in the sect's mode of observance." *Id.* at 1311. Moreover, we stressed that "the reasonableness of the ban on inmates' conducting their own religious services is related to the availability of substitutes." *Id.*

*Dobbs*, 807 F.2d 734, 737–39 (8th Cir. 1986). Moreover, the Court has held that an inmate has no right to remain at a particular facility under the Due Process Clause. *Meachum v. Fano*, 427 U.S. 215, 225 (1976). Based on those precedents, "a reasonable government official would not have known the official was violating clearly established law" by failing to halt inmates' transfers to a facility that reasonably did not offer group worship. *See Kramer v. Pollard*, 497 F. App'x 639, 644 (7th Cir. 2012); *see also West v. Grams*, 607 F. App'x 561, 565 (7th Cir. 2015) ("It has never been clearly established that inmates have a right to inmate-led group worship under the First Amendment … where non-inmate volunteers are unavailable and prison administrators justify the restriction for security reasons."); *Turner v. Hamblin*, 590 F. App'x 616, 619–20 (7th Cir. 2014).

Finally, this is not the "rare case" where Liebel's conduct was "so egregious and unreasonable" that the constitutional violation was "patently obvious" to any reasonable official. *See Jacobs*, 215 F.3d at 767; *Abbott*, 705 F.3d 724. Plaintiffs contend that Liebel's First Amendment violation was obvious because he was responsible for managing religious services, exercised at least some control over the transfer of prisoners to facilities with kosher kitchens, and knew that Wabash Valley did not offer congregate Jewish services. We do not agree. On the contrary, Liebel acted reasonably given the circumstances. Not only were his actions not counter to any of our precedent, but he also made a significant effort to recruit Jewish volunteers so that Wabash Valley could offer group prayer and study. Moreover, Liebel was not even the ultimate decisionmaker with respect to plaintiffs' transfer; he simply had the ability to delay it. Thus, Liebel did not violate clearly established law, and he is entitled to qualified immunity.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.