In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-2286

EARNISE PAM and SASHA BOYD, Co-Special Administrators of
the Estate of RODRIQUEZ D'AUNDRE PAM,

*Plaintiffs-Appellants*,

*v.*

CITY OF EVANSVILLE, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 3:22-cv-00172 — **Matthew P. Brookman,** *Judge*.

ARGUED MAY 21, 2025 — DECIDED SEPTEMBER 26, 2025

Before LEE, KOLAR, and MALDONADO, *Circuit Judges*.

KOLAR, *Circuit Judge*. After Rodriquez D'Aundre Pam was
shot and killed by law enforcement officers responding to a
911 call, his estate sued the officers involved for violating his
Fourth Amendment rights. Following discovery, the district
court granted summary judgment against Pam's estate. We
affirm on qualified immunity grounds because the officers'

belief that Pam was threatening them with a firearm prior to shooting him was objectively reasonable.

## I. Background

At around 8:18 pm on November 8, 2020, Heather Geier called 911 reporting that a Black man wearing a white shirt and red pants—a match of Pam's appearance—was in her backyard brandishing a handgun. She told the dispatcher that the man, whom she did not recognize, had pointed the gun at the family dog, which was leashed in the yard, and then aimed the gun at her.

Body camera footage from the responding officers captured the bulk of the following events. Officer Cory Offerman of the Evansville Police Department responded first, while Geier was still on the line. When Offerman was around the corner from Geier's home, dispatch relayed that Pam had shot Geier's dog. Offerman acknowledged in his deposition that he could not hear any gunshots, despite being only 100 to 200 feet from Geier's home at that time.[1]

Offerman got out of his patrol car in a back alley behind Geier's home and pointed his rifle toward Pam, who was standing on the back porch. Offerman was approximately 50 to 75 feet from the home. He commanded Pam to "show me your hands" several times. At this point Geier's dog began barking loudly. After roughly fifteen seconds without compliance, Offerman approached Geier's home from the back alley and told Pam to "get on the ground." Pam was visible on

---

[1] Geier later explained to the police that she mistakenly believed Pam shot her dog amidst the frenzied situation.

the back porch of the house trying to work the doorknob to the home with his right arm. He appeared slouched.

As Offerman entered the backyard, Pam appeared to give up on the door and walked alongside the back of the home toward the side yard. Offerman admitted at his deposition that he saw Geier's unharmed dog in the yard, which helped him confirm he was at the right house. During this entire time, Offerman trained his rifle on Pam and continued to command Pam to get on the ground, without success.

Once Offerman was in the yard, Pam turned toward him and put his hands in his pockets. Offerman immediately yelled for Pam to remove his hands from his pockets, which he did. At that point, Officer John McQuay, also an Evansville police officer, rushed on the scene with his gun drawn shouting "I'm going to shoot your ass" at Pam. McQuay stood to the right of Offerman. Offerman continued to command Pam to keep his hands out of his pockets.

As McQuay shined his flashlight on Pam, Pam raised his left hand toward the officers and kept his right hand at his side. In response, McQuay fired. Offerman followed. Altogether, the officers fired multiple times within one second. Offerman was at the scene for approximately one minute before discharging his weapon; McQuay shot within approximately fourteen seconds of his arrival. Pam died at the scene.

As Pam fell to the ground, a black object rolled away from his body. Approaching Pam, the officers recognized this object as a handgun. At their depositions, both officers testified that they only fired after Pam produced a handgun from his pocket and began to raise it toward McQuay. During interviews with the Evansville Police Department's internal affairs

investigation, they both said Pam held the gun in his right hand. Nonetheless, Kevin Campbell, the officer who led the police department's investigation of the shooting, testified that he did not see Pam holding a gun in his hand in the video.

As it turned out, Pam was extremely intoxicated at his time of death, registering a .310 blood alcohol content, almost four times the legal limit to drive in Indiana. *See* Ind. Code. § 9-30-5-1. Pam was drinking with a friend earlier in the day. Shortly before the shooting, they had driven to another friend's house, who lived close to Geier's home. Pam's friend went inside, and when he returned to the car, Pam had wandered off. Footage from the American Legion behind Geier's home showed Pam stumbling down the alleyway toward her house shortly before his death.

The district court granted summary judgment for all Defendants because it found it undisputed that Pam pointed a gun at the officers before they fired. Pam's estate now appeals.[2]

## II. Analysis

We review a grant of summary judgment *de novo*, viewing the facts in the light most favorable to Pam's estate, the non-moving party. *Anderson v. Street*, 104 F.4th 646, 651 (7th Cir. 2024). When there is any "genuine dispute of material fact," summary judgment cannot stand. Fed. R. Civ. P. 56(a). Of course, Plaintiffs must have "enough evidence to place [their] version of events beyond the level of mere speculation or conjecture." *Osborn v. JAB Mgmt. Servs., Inc.*, 126 F.4th 1250, 1258

---

[2] Plaintiffs only appeal the grant of summary judgment in favor of Offerman and McQuay. They leave the rest of the district court's rulings undisturbed and, as such, we do not address them on appeal.

(7th Cir. 2025) (quotations omitted). There must be some factual foundation for us to draw favorable reasonable inferences for Plaintiffs. *Id.*; *Driveline Sys., LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019).

Because of the centrality of videos in this case, we first frame the proper role of such evidence. We always begin with the overarching command to view evidence in the light most favorable to the non-moving party. In *Scott v. Harris*, the Supreme Court held that a police officer who rammed into the plaintiff's car to terminate a high-speed chase—severely injuring the driver—was entitled to summary judgment on an excessive force claim. 550 U.S. 372, 386 (2007). According to the plaintiff's version of events, "rather than fleeing from the police," the pursuit resembled the benign conduct of someone "attempting to pass his driving test[.]" *Id.* at 379. But the uncontroverted police footage from the incident told "quite a different story," namely, depicting "a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury." *Id.* at 379–80.

The Supreme Court affirmed the grant of summary judgment, accepting the videos as displaying the undisputed narrative of events. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. *Scott* did not create a new rule or treat "video footage as a distinct type of evidence that is not subject to the normal summary judgment strictures." *Hurt v. Wise*, 880 F.3d 831, 840 (7th Cir. 2018), *overruled on other grounds by*, *Lewis v. City of Chicago*, 914 F.3d 472 (2019).

Instead, like any piece of evidence filtered through the prism of summary judgment, videos that establish a fact "'with confidence' and 'beyond reasonable question'" may eliminate factual disputes. *Smith v. Finkley*, 10 F.4th 725, 730 (7th Cir. 2021) (quoting *Johnson v. Rogers*, 944 F.3d 966, 967, 969 (7th Cir. 2019)). But like any other evidence, videos that are "unclear, incomplete, and fairly open to varying interpretations" cannot resolve evidentiary matters short of trial. *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018).

The point is rather simple: there is nothing special about video evidence. Should it depict an event or fact of the case so obviously that it leaves no room for reasonable disagreement, then we may rely on it. *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023). In other words, video can resolve a genuine dispute at summary judgment only if it offers "irrefutable evidence" that "utterly discredit[s]" countervailing factual assertions. *Gant v. Hartman*, 924 F.3d 445, 450 (7th Cir. 2019).

After extensive review of the videos, including frame-by-frame analysis, we find the videos create a dispute over whether Pam raised a weapon before the officers shot him. While Pam definitely raised his *left* hand just before being shot, it is not clear he held a gun in that hand at the time. When speaking to internal affairs, both Offerman and McQuay said Pam held the weapon in his *right* hand, and the blurry video cannot put that possibility to rest. *See Gupta v. Melloh*, 19 F.4th 990, 998 (7th Cir. 2021).

But considering the totality of the evidence, we do find undisputed that Pam behaved in a manner consistent with wielding a firearm. *Johnson*, 944 F.3d at 969–70 (finding video unambiguous for some issues, but undisputed on others). We acknowledge the poor lighting obscures a clear image of any

weapon in Pam's hand. Still, the videos show that seconds before the shooting, Pam placed his right hand in his pocket, assumed a stance with his right arm hovering behind his body, and raised his left arm to his chest. Then, just after the shots, a gun fell in front of Pam's body, which officers recovered. These facts align with the officers' depositions. And the responding officers undisputably believed Pam had possessed and brandished a firearm toward Geier minutes earlier.

Pam's estate did not point the district court, nor our panel, to anything in the record allowing for a "different reasonable interpretation" of the video. *Pryor v. Corrigan*, 124 F.4th 475, 490 (7th Cir. 2024). Indeed, Plaintiffs have failed to highlight any "definite, competent" countervailing facts to rebut Defendants' narrative. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Of course, one challenge in a case like this is that "the person most likely to rebut the officers' version of events" has been killed. *King v. Hendricks County Comm'rs*, 954 F.3d 981, 985 (7th Cir. 2020) (quotation omitted). So to "ensure fairness to a deceased plaintiff … given the impossibility of victim testimony to rebut the officers' account, we scrutinize all evidence to determine whether the officers' story is consistent with other known facts." *Id.* We are mindful of this duty, and it goes a long way toward why we do find a genuine dispute whether Pam actually pointed a weapon at the officers. But even viewed through this generous lens, no "physical" or "concrete" evidence contradicts the core finding that Pam's behavior was consistent with an individual threatening officers with a weapon. *Id.* at 985, 987.

One way to conceptualize this deficiency is to imagine how Plaintiffs would carry their burden of proof if this case reached a jury. What evidence could Plaintiffs present to

counter the officers' testimony and explain how the gun rolled a few feet in front of Pam's body? While parts of the videos are too fuzzy to affirmatively confirm the officers' story, they are similarly too inconclusive to contradict it. *Id.* at 986–87. Without the videos, we would have no choice but to accept the officers' story, which is consistent with the physical evidence. *See id.* at 983, 985–87. The only question is whether the videos upset that narrative to create a genuine factual dispute. Viewed in Plaintiffs' favor, the footage still does not support a genuine dispute that when Pam removed his hands from his pockets, positioned his right hand behind him, and raised his left hand toward officers, his actions were consistent with an individual holding a handgun.

## A.  The Qualified Immunity Test

Qualified immunity protects government officials from lawsuits unless the plaintiff can show (1) the official violated his constitutional or statutory rights, and (2) the right was clearly established at the time. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014). We look to Supreme Court caselaw, our own precedent, and surrounding circuits when discerning whether a right was clearly established. *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017). Unless no reasonable officer could have thought they were acting lawfully, we must extend immunity. *Abbott v. Sangamon County, Illinois*, 705 F.3d 706, 724 (7th Cir. 2013).

We have been "repeatedly" told not to "define clearly established law at a high level of generality" and instead look to "whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation omitted). That "specificity is especially important in the Fourth Amendment context, where the [Supreme] Court has

recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). This is because excessive force cases are highly fact dependent, so we must find existing precedent that "squarely governs the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quotation omitted). Cases with similar facts can "help move a case beyond the otherwise hazy border between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful." *Id.* at 105 (quotation omitted).

Still, the demand for past precedent "is not unbending." *Lopez v. Sheriff of Cook County*, 993 F.3d 981, 988 (7th Cir. 2021). A plaintiff does not need to find "identical factual circumstances, lest qualified immunity become absolute immunity." *Id.* The "clearly established" prong simply demands it to be "sufficiently clear that every reasonable official would have understood that what he is doing violates" the constitutional right. *Reichle v. Howards*, 566 U.S. 658, 664–65 (2012) (cleaned up). Some "breathing room to make reasonable but mistaken judgments about open legal questions," *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011), advances that goal by balancing the "dueling interests" of "allowing officials to perform their duties reasonably without fear of liability on the one hand and affording members of the public the ability to vindicate constitutional violations by government officials who abuse their offices on the other." *Lopez*, 993 F.3d at 987 (quotation omitted).

Qualified immunity extends not only to reasonable mistakes of law, but also reasonable misperceptions of fact.

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Translated to
Fourth Amendment claims, an officer who could have mis-
takenly, but reasonably, believed certain facts exist to justify
a given level of force is entitled to qualified immunity. Be-
cause we hold Offerman and McQuay's perceptions of the sit-
uation were reasonable, and their subsequent actions in re-
sponse did not violate clearly established law, we need not
address whether there was a Fourth Amendment violation.
*Smith v. Kind*, 140 F.4th 359, 365 (7th Cir. 2025) (explaining we
may exercise our discretion in which prong to address first).

## B. Application of the Clearly Established Prong

We turn to the application of clearly established law. For
Fourth Amendment claims, we must do so by placing our-
selves in the position of an objectively reasonable officer.
*Saucier*, 533 U.S. at 208. There is no genuine issue of material
fact that Offerman and McQuay faced a situation where they
reasonably believed Pam had trespassed onto Geier's prop-
erty, pointed a firearm at her, attempted to enter her house,
and failed to follow repeated commands to surrender himself.
Only after the officers were enmeshed in this high stakes con-
frontation did Pam face the officers, reach into his pocket, and
position his body and hands in a manner consistent with
holding a weapon. We independently analyze qualified im-
munity for each officer. Because Offerman and McQuay were
on the same radio and communicating throughout, we im-
pute the reasonable beliefs discussed below to both. *United
States v. Williams*, 627 F.3d 247, 256 (7th Cir. 2010) ("[T]he
knowledge of other officers may be imputed to the requesting
officer, so long as the officers are in close communication with
one another.").

The Fourth Amendment prohibits law enforcement from unreasonably using deadly force against an individual. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."). Deadly force, like any use of force, is only constitutional when it is objectively reasonable, "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

We must consider the totality of the circumstances, "including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015) (quoting *Graham*, 490 U.S. at 396). We have distilled the inquiry into a useful test: the officer must have "probable cause to believe that the armed suspect (1) 'poses a threat of serious physical harm, either to the officer or to others,' or (2) 'committed a crime involving the infliction or threatened infliction of serious physical harm' and is about to escape." *Manery v. Lee*, 124 F.4th 1073, 1079 (7th Cir. 2025) (quoting *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002)).

We must evaluate the threat Pam presented based on what the officers reasonably believed. Under qualified immunity's shroud, Offerman and McQuay do not need to have correctly identified Pam with a weapon; they needed to harbor a reasonable perception that he held one. *See, e.g., Gooden v. Howard County*, 954 F.2d 960, 965–66 (4th Cir. 1992) (noting the question is whether officers held mistaken but reasonable

misperception of situation); *Pollard v. City of Columbus*, 780 F.3d 395, 403 (6th Cir. 2015) (holding officers reasonably, but mistakenly, believed plaintiff posed deadly threat when he "made gestures suggesting he had a weapon"); *A.K.H. by and through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) ("[T]he relevant question for purposes of qualified immunity is whether [an officer] could reasonably have believed that [a suspect] posed" a threat sufficient to use deadly force). Thus, "[a]n act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment." *Wealot v. Brooks*, 865 F.3d 1119, 1128 (8th Cir. 2017) (quotation omitted).

Regardless of whether Pam actually held his firearm prior to the shooting, a reasonable officer could have thought it so. Even assuming Offerman and McQuay *were* mistaken that Pam held a gun, the confluence of dangerous circumstances, in conjunction with Pam's furtive movements and the dim lighting, presented the "tense, uncertain, and rapidly evolving" situation where "split-second judgments" are a must, and the law allows for reasonable errors. *Graham*, 490 U.S. at 396–97. Given the evidence before us—noncompliance, a poorly lit yard at night, a 911 call stating Pam had a weapon, and hand movement into pockets—Pam's actions give rise to a reasonable belief he held a gun. *Cf. Est. of Smart v. City of Wichita*, 951 F.3d 1161, 1173 (10th Cir. 2020) (noting qualified immunity pierced when officers act "on a *grossly* mistaken belief that a suspect poses a deadly threat" (emphasis added)). Moreover, nothing in the record undercuts this finding. Rather, the physical evidence corroborates it—a gun rolled a few feet in front of Pam's body as he fell.

With the facts Offerman and McQuay reasonably believed to be true settled, we move to the legal question. It is not "beyond debate" that deploying deadly force after reasonably believing Pam produced a firearm violated his Fourth Amendment rights in these circumstances. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citation omitted). We underscore the importance of locating factually analogous cases in the excessive force context because it is difficult for officers to determine how fact-dependent legal conclusions will apply to the specific scenarios they confront. *Mullenix*, 577 U.S. at 12. To be sure, when it is plainly obvious an officer acted unlawfully, a factually analogous case is unnecessary—indeed we would hope there are few cases to compare in the truly vindictive scenario. *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013); *Kemp*, 877 F.3d at 351.

The circumstance confronting Offerman and McQuay, however, was at most on the "hazy border between excessive and acceptable force," which demands an analog in case law. *Kisela*, 584 U.S. at 105 (quotation omitted). At the time of the shooting, it is undisputed that the officers had a reasonable belief that Pam had (1) not been complying with commands for approximately 15 seconds,[3] (2) pointed his gun at Geier, (3) pointed his weapon at Geier's dog, (4) tried to enter her home, and (5) put his hands in his pockets when he faced the officers. Then, before the fatal shot, the officers reasonably believed he produced a firearm and began to raise it toward McQuay. Certainly, some reasonable officers would have

---

[3] A reasonable juror could find that Pam did not actually hear Offerman's commands until the officer crossed into Geier's yard, as Pam was 50 to 75 feet away when the encounter began. So, the 15 second mark starts when Offerman entered the yard.

thought Pam posed an imminent serious threat in these circumstances, which would make the use of deadly force reasonable under the Fourth Amendment. *Reichle*, 566 U.S. at 663–65.

An individual "does not pose an immediate threat of serious harm solely because he is armed." *Est. of Biegert v. Molitor*, 968 F.3d 693, 700 (7th Cir. 2020) (Barrett, J.) (quotation omitted). But when officers hold a reasonable belief that an individual is threatening them with a firearm, they may use deadly force without waiting until the last second before they are shot. *See Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018); *DeLuna v. City of Rockford*, 447 F.3d 1008, 1012–13 (7th Cir. 2006). That principle is even more applicable when someone changes the "status quo" of a confrontation by motioning for a weapon in response to police presence. *Siler v. City of Kenosha*, 957 F.3d 751, 760 (7th Cir. 2020).

As we have said, and as our review of sister circuits reaffirms, "[w]hether a suspect is holding or touching a weapon when shot is . . . of great consequence." *Smith*, 10 F.4th at 745; *see also Est. of Valverde v. Dodge*, 967 F.3d 1049, 1062 (10th Cir. 2020) (finding no violation of clearly established right when officers shot after suspected drug dealer removed gun from his waistband); *Valderas v. City of Lubbock*, 937 F.3d 384, 390 (5th Cir. 2019) (stating officer justified in firing after seeing suspect pull a gun from his waistband because he "was not required to wait to confirm [the suspect] intended to use the gun before shooting"); *Jean-Baptise v. Gutierrez*, 627 F.3d 816, 821–22 (11th Cir. 2010) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."(quotation omitted)); *Elliott v. Leavitt*, 99 F.3d 640, 644–45 (4th Cir.

1996) (stating that "[n]o citizen can fairly expect to draw a gun on police without risking tragic consequences" and acknowledging suspect was pointing weapon at officers at time of shooting). These decisions assure us this case presents, at best for Plaintiffs, a close call.

Ultimately, Plaintiffs have not put forth any cases where we have found an officer who used deadly force in tense circumstances like the one at bar clearly ran afoul of the Fourth Amendment. This is far different than a previous case, for example, where we denied qualified immunity to officers who fired on an individual who merely possessed a gun in his home. *Weinman*, 787 F.3d at 448–49. We stress that we rest our analysis on the facts viewed from the vantage point of reasonable officers on the scene. *Graham*, 490 U.S. at 396. It matters only tangentially whether Pam actually held the firearm. *See Sabbe v. Wash. County Bd. of Comm'rs*, 84 F.4th 807, 827–28 (9th Cir. 2023) ("Where an officer's particular use of force is based on a mistake of fact, we ask whether a reasonable officer would have or *should* have accurately perceived that fact." (quotation omitted)). Rather, our decision hinges on the determination that reasonable officers could have concluded that Pam had recently aimed his firearm at a person and an animal, and critically, pulled out a gun in response to police orders in the moments before the officers fired. *Lopez*, 993 F.3d at 989–90.

To be clear, prior to the final shots, Offerman and McQuay did not respond to the situation in the same way. Nonetheless, the differences in their actions do not change that both are entitled to qualified immunity. Offerman, the first on the scene, spent about one minute repeatedly ordering Pam to surrender himself. Offerman appeared to make genuine

attempts to deescalate the situation. When McQuay arrived, he shouted that he would shoot Pam if Pam did not comply. Within seconds of McQuay's arrival, the officers opened fire.

Even if we assume McQuay's tactics were unwarranted here, this does not change our conclusion. The Supreme Court has not addressed whether or how to weigh any "unreasonable police conduct prior to the use of force that foreseeably create[s] the need to use it." *County of Los Angeles v. Mendez*, 581 U.S. 420, 429 n.* (2017); *Barnes v. Felix*, 145 S. Ct. 1353, 1360 (2025) (declining to address "whether or how an officer's own creation of a dangerous situation factors into the reasonableness analysis" (quotation omitted)). And under this Court's precedent, an officer's "bad tactics" do not violate the Fourth Amendment unless the actions fall "so far outside the bounds of reasonable behavior that the deadly force was almost entirely a result of the officers' actions." *Biegert*, 968 F.3d at 698. For example, in *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993), we declined to apply qualified immunity to a police officer who stepped in front of a fleeing car and then, to avoid being hit by the car, shot the driver. Here, neither officer's conduct crossed a similar line. Thus, they are entitled to qualified immunity.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment.